**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.                                                                    No. 95-5866

ROBERT J. MERRITT,
Defendant-Appellant.

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
Frederic N. Smalkin, District Judge.
(CR-95-167-S)

Argued: March 7, 1997

Decided: June 4, 1997

Before WILKINSON, Chief Judge, and RUSSELL and
HALL, Circuit Judges.

_____

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** Michael Scott Evans, Manhattan Beach, California, for
Appellant. Kathleen O'Connell Gavin, Assistant United States Attor-
ney, Baltimore, Maryland, for Appellee. **ON BRIEF:** Lynne A. Bat-
taglia, United States Attorney, Baltimore, Maryland, for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

Robert J. Merritt appeals his convictions of bank fraud and of twice making false statements to a financial institution. He also contends that the district court incorrectly calculated his sentence. We affirm.

I.

During the autumn of 1994, Merritt, doing business as Mortgage Partners Group, Ltd. (MPG) of Pasadena, California, negotiated with Dr. Lazslo Tauber of Bethesda, Maryland, for the purchase of eight commercial office buildings in Washington, D.C., and New York City, priced at $736 million. Merritt was unable, however, to meet Tauber's demand for $5 million in earnest money, so Tauber found another buyer. During the early stages of their negotiations, Tauber supplied Merritt with a substantial amount of personal financial information, including the names of the banks with which he did business.

On February 17, 1995, Merritt telephoned one of those banks, the First National Bank of Maryland (FNB), seeking to obtain a letter of credit for $300 million. Robert McLewee, a senior vice-president in FNB's mortgage banking department, returned Merritt's call. When McLewee dialed the number in California that Merritt had left, he was greeted by an automated answering system that permitted the caller to connect to any of several businesses, one of which offered psychic readings. McLewee reached Merritt at his office and arranged to have Adele Ammons, a vice-president in the bank's real estate department, contact him by telephone.

McLewee's encounter with Merritt raised the former's suspicions. FNB alerted the Secret Service, which obtained Ammons's consent to record her conversations with Merritt. During the next ten days, by phone calls, mailings, and facsimiles, Merritt filled in the details of

2

his proposal. He represented to Ammons that MPG was negotiating with a pension fund, Provider's Plus, to borrow $500 million to acquire office buildings in Washington, D.C.

Merritt proposed depositing $200 million of the loan proceeds with FNB, which would issue a certificate for that amount bearing six percent interest. In return, FNB was to provide Merritt with a $300 million letter of credit, to be used as security for the loan with Provider's Plus; the bank would draw down the certificate of deposit to make MPG's annual $30 million interest payments to Provider's Plus for the ten-year term of the loan. At the end of the ten years, having paid out $300 million, FNB would retain the balance of the certificate, which Merritt said would amount to approximately $13 million.

Merritt mailed FNB a "business profile" of MPG. Dr. Tauber was listed as one of Merritt's partners, to whom the profile attributed approximately 94% of the partnership's assets. Stanley Smith, said to be a retired Air Force colonel who had served as a director on the boards of two major corporations, was also named as a partner, and Owen Haynes, a contractor, was, according to the profile, MPG's "Clerk of the Works."

In actuality, neither Tauber nor Haynes was associated in any way with Merritt or MPG. Smith was, at least nominally, Merritt's partner, and he had served in the Air Force, but he had never risen beyond the rank of First Lieutenant and he had never served on any corporate board.

Smith, apparently believing Merritt to be a legitimate businessman, had given him more than $450,000 in cashier's checks over a 3-4 year period, but had never realized any return on those "investments." Indeed, on October 12, 1993, following an investigation by the Attorney General of California, Merritt consented to the entry of a judgment in that state's Superior Court. The accompanying order enjoined Merritt from selling unregistered securities, and it directed that he pay $70,000 restitution to Smith and to Smith's two sons. Smith never collected on the judgment, however, because he agreed to allow Merritt to roll the debt over into a new investment scheme.

3

Provider's Plus, as it turned out, was not a pension fund with $500 million to lend. It was instead a telemarketing company with assets of $15,000.

Merritt was charged with bank fraud and with three counts of making false statements to a financial institution, in violation of, respectively, 18 U.S.C. §§ 1344 and 1014. As to the latter three charges, it was alleged that Merritt had falsely represented to FNB that (1) MPG was in the process of acquiring office buildings in the Washington, D.C., area; (2) Provider's Plus would supply the $200 million necessary to obtain the letter of credit; and (3) Dr. Tauber was associated with MPG. The jury acquitted Merritt of the first of the three false-statement charges, but it found him guilty of the others and of the fraud. The district court entered a judgment of conviction on the verdicts, and it sentenced Merritt to 70 months in prison. Merritt appeals his convictions and his sentence.

II.

Though his trial counsel lodged no objection, Merritt now contends that the government should not have been permitted to introduce evidence of Smith's payments and the California judgment order. He maintains that this evidence was of "other crimes, wrongs, or acts," generally proscribed by Fed. R. Evid. 404(b). The government counters that the evidence revealed the true nature of Smith's relationship with Merritt, and, thus, that Merritt lied to FNB about that relationship. According to the government, the link between Merritt's representations concerning Smith and the scheme to defraud FNB resulted in Merritt's dealings with Smith being direct evidence of the scheme, and not 404(b) evidence.

Plainly, Merritt was not charged with making false statements to FNB regarding Smith. Nevertheless, even were we to accept Merritt's characterization of the evidence as relevant only to demonstrate his seeming propensity to devise fraudulent real estate schemes, we do not believe that he was sufficiently prejudiced by its admission to warrant vacation of his convictions for plain error. See Fed. R. Crim. P. 52(b); United States v. Loayza, 107 F.3d 257, 262-63 (4th Cir. 1997) (absent timely objection at trial, only those errors or defects affecting the defendant's substantial rights may be noticed). Merritt

4

was accused of very well-defined crimes, i.e., making specific false statements to FNB which, in turn, amply evidenced an intentional scheme to defraud. This was hardly the type of case in which the jurors' collective judgment was likely to be colored by mention of extraneous matters; indeed, Merritt's acquittal on the first false-statement count strongly indicates that this jury paid attention to the evidence and understood its charge.[1]

III.

Having satisfied ourselves that Merritt's convictions were validly obtained, we move on to consider his sundry attacks on his sentence. Some background is in order.

A.

1.

The base offense level for fraud is 6, but an upward adjustment of 1-18 levels may be called for, depending on the loss attributable to the fraud. United States Sentencing Commission, Guidelines Manual,

_____

[1] To the extent that evidence of Merritt's dealings with Smith might have been erroneously admitted, the error was not compounded by the admission of evidence concerning the California judgment order. On cross-examination by defense counsel, Smith testified that Merritt had never promised him that his investment would be risk-free. Smith's testimony appears to have been at odds with the terms of the judgment order, which enjoined Merritt from continuing to represent that the risks attendant to his investment programs were "either minimal or essentially non-existent." In light of Smith's testimony on cross-examination, the district court allowed the government to inquire about the terms of the injunction on redirect. This impeachment of Smith was necessary to avoid leaving the jury with a false impression, and, therefore, was entirely appropriate.

Merritt's final challenge to his convictions -- that the Secret Service was required to obtain a court order before recording his telephone conversations with Ammons -- is entirely without substance. The plain language of the wiretap statute permits the government to record any communication with the prior consent of one of the parties. See 18 U.S.C. § 2511(2)(c).

§ 2F1.1(a)-(b) (Nov. 1994).[2] At the extremes, the base offense level is not adjusted for losses to the victim(s) of $2,000 or less, but losses exceeding $80 million merit the maximum 18-level increase. In fraudulent loan application and contract procurement cases, if the intended loss exceeds the actual loss, Application Note 7(b) specifies that the former is to be used to calculate the applicable increase. The Note also provides, however, that where the loss calculation significantly understates or overstates the seriousness of the defendant's conduct, the district court may depart from the indicated level.

2.

With the above principles in mind, the district court upwardly adjusted Merritt's base offense level by 18; the court found that, although FNB had suffered no actual loss as the result of Merritt's crimes, the intended loss amounted to $100 million. The district court's calculation was premised upon the hypothetical loss that would have occurred had FNB actually issued the $300 million letter of credit, and had then been forced to honor it prior to any significant interest having accrued on the $200 million certificate of deposit.

The court then downwardly departed 4 levels, on the ground that a loss adjustment increase totaling 14 levels more accurately reflected the seriousness of Merritt's conduct. To the loss-adjusted offense level of 20, the district court added 6 additional levels: 2 for more than minimal planning, see USSG § 2F1.1(b)(2)(A); 2 because the acts constituting Merritt's offenses violated the California judgment order, see USSG § 2F1.1(b)(3)(B); and 2 for obstruction of justice, pursuant to USSG § 3C1.1. The resultant adjusted offense level of 26, in conjunction with Merritt's criminal history (Category I), produced a sentencing range of 63-78 months' imprisonment. Except for the planning-based increase, Merritt contests all of the offense level adjustments contributing to the 70-month sentence ultimately imposed.

_____

[2] Merritt was sentenced on October 25, 1995, within the effective dates of the 1994 Guidelines Manual.

B.

The district court colorfully described Merritt's scheme as "cocka-mamie," and it opined that the letter of credit "would probably not have been issued by any sane institution." Merritt seizes upon this characterization and the court's observation that Provider's Plus lacked "two nickels to rub together" (much less the wherewithal to lend Merritt the seed money that was the agreed-upon prerequisite to obtaining the letter of credit), arguing forcefully that, inasmuch as it was "impossible" for FNB to have actually sustained a loss, no loss enhancement should apply.

Merritt's argument fails at the outset; though it was, perhaps, highly improbable that his scheme would be successful, it was not "impossible." To begin with, we know of no authority that would entitle a person convicted of a crime to a lesser sentence based on the happenstance that the intended victim was resistant to being victimized.[3] That being the case, we must examine the scheme in the abstract and recognize the possibility that some bank (perhaps an "insane" one) might have swallowed Merritt's story, and, if it had, that it could have lost $100 million. Merritt could have found an alternative source for the seed money or, more likely, he could have finagled the issuance of the letter of credit on his word that deposit of the $200 million was imminent.[4]

Admittedly, determining a "loss" where none has actually occurred involves more uncertainty than we might ordinarily be comfortable

_____

[3] There is authority, certainly, for increasing a defendant's punishment for having selected a victim who is especially prone to the offense. See, e.g., United States Sentencing Commission, Guidelines Manual, § 3A1.1(b) (Nov. 1995) (providing for a 2-level upward adjustment where the victim was "unusually vulnerable due to age, physical or mental condition" or was "otherwise particularly susceptible to the criminal conduct"). The discrepancy is one of the risks assumed by those who decline to behave within the confines of the law.

[4] The district court put it more bluntly, but no less accurately: "All you have to do is sit down and read the cases of bankers who have been defrauded and you would understand that a lot of them have an IQ about the . . . size [of] their shoe."

7

with in deciding how much time a person must spend in prison. The evidence in this case raises a fair inference that Merritt fudged his credentials in the hope of becoming a legitimate real estate investor, but that he lacked the sophistication to realize the transparency of his proposal; it may well be that he did not intend FNB to suffer any loss.[5] Nevertheless, cheats and swindlers who go down swinging for the bleachers ought to be punished more severely than those who bunt foul on the third strike.

C.

The two-level increase for obstruction of justice stems from Merritt's actions upon his release from custody following arrest, which he secured by posting a $15,000 cash bond. On May 23, 1995, Merritt moved to substitute for the cash a house in California that his landlord had conveyed to him by quitclaim deed two weeks earlier. The motion was denied. It was subsequently revealed that Merritt had failed to disclose to the court that he had simultaneously devised a second quitclaim deed re-conveying the property to the landlord that, by written agreement, he would be bound to execute in the event that he was unable to obtain refinancing of the loan note within forty-five days.

Inasmuch as the agreement to execute the second quitclaim deed could have interfered with the district court's interest in the property (had it actually been substituted for the cash), the court found that Merritt's failure to disclose its existence resulted in his "providing materially false information to a judge or magistrate." USSG § 3C1.1, comment. (n.3(f)). The district court's finding is not clearly erroneous; the two-level increase was, therefore, appropriate.[6]

_____

[5] Though Merritt may not have intended any loss, it does not follow that the "intended loss," for sentencing purposes, must be zero. It is sufficient that Merritt intended to induce FNB to "unknowingly subject itself to a significant and unappetizing risk[.]" United States v. Baum, 974 F.2d 496, 499 (4th Cir. 1992). In such a case, the potential consequences of that risk provide the best measure of the loss that was "intended." Id.
[6] We are likewise unpersuaded by Merritt's remaining argument respecting the validity of his sentence. Merritt's scheme clearly consti-

8

IV.

Merritt's convictions and his sentence are affirmed.

AFFIRMED

_____

tuted a violation of the California judgment order, the terms of which enjoined him from "[m]aking . . . any untrue or misleading statements in connection with the sale [or] offer for sale[of], or inducement to purchase . . . interests in real estate." The order plainly applies to statements made concerning "the sale" of real estate; it is of no moment that, with regard to the transaction actually proposed by Merritt, he was to be the purchaser -- and not the seller -- of the Washington, D.C., office buildings. Thus, the district court properly applied the two-level increase provided by USSG § 2F1.1(b)(3)(B) for offenses involving the "violation of any judicial . . . order, injunction, decree, or process[.]"

We note finally that we may not review the district court's decision to refuse Merritt's request for a downward departure in order to care for his mother, absent an indication (not present here) that the court mistakenly believed that it lacked the legal authority to depart. See, e.g., United States v. Fletcher, 74 F.3d 49, 56 (4th Cir.), cert. denied, 117 S. Ct. 157 (1996).

9